# EXHIBIT 2

7/11/2022 5:47 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 66211920
By: Maria Rodriguez
Filed: 7/11/2022 5:47 PM

CAUSE NO. _____

– – – – – – – – – – – – – – – – – – – – – – – – – X

SARAH COPLAND, individually and on behalf
of the ESTATE OF ISAAC SIDNEY OEHLERS;
MARY DEVILLE COCHRANE, individually
and on behalf of the ESTATE OF YVONNE
SURSOCK COCHRANE; TANIA DAOU,
individually and on behalf of the ESTATE OF
JEAN FREDERIC ALAM; CEDRIC ELLIS
ALAM, YANN VICTOR ALAM, FOUAD
DEBS, GEORGE CORTAS, GEORGES
JUVELEKIAN, AND ASYA EL-MEEHY,

IN THE DISTRICT COURT OF

*Plaintiffs,*

HARRIS COUNTY, TEXAS

v.

TGS ASA and TGS–NOPEC GEOPHYSICAL
CO.,

*Defendants*.

– – – – – – – – – – – – – – – – – – – – – – – – – X

_____ JUDICIAL DISTRICT

### PLAINTIFFS' ORIGINAL PETITION

Plaintiffs, by and through their attorneys Ford O'Brien Landy LLP, for their Petition

against Defendants TGS ASA and TGS–NOPEC Geophysical Co. (collectively, "TGS" or

"Defendants"), allege, on knowledge as to their own actions and otherwise upon information and

belief, as follows:

### INTRODUCTION

1.      The MV Rhosus (the "Rhosus") made its final port of call at Beirut, Lebanon, in

or about November 2013 carrying approximately 2,750 metric tonnes of ammonium nitrate, a

deadly explosive. The Rhosus—an unsatisfactory ship with opaque ownership already over

capacity before arriving in Beirut—was ostensily chartered by a seismic surveying company to

transfer heavy equipment from Beirut to Jordan pursuant to a 2012 contract (the "Contract") with

Lebanon's Ministry of Energy and Water ("Ministry of Energy"). The selection of this particular

ship for the task of picking up 160 tonnes of seismic equipment never made sense. The derelict vessel was known in the area as barely seaworthy and could not have carried any additional load as it was already significantly over capacity. It did not even have the necessary parts to permit the vibrator trucks and other heavy seismic equipment to be loaded onto it. Indeed, rather than seismic equipment being onloaded, the ammonium nitrate would be offloaded. In fact, immediately prior to the Rhosus entering the Port of Beirut, a letter was sent by UNIFIL—the UN peacekeeping mission to Lebanon—to the Lebanese Army warning about the "suspicious" ship and its "dangerous" cargo. Everyone recognized that the Rhosus was a dangerous ship with hazardous cargo. As such, the Rhosus would never leave the Port of Beirut. Its cargo of ammonium nitrate was unloaded and would later be the catalyst for the August 2020 explosion in the Port of Beirut (the "Beirut Blast"), one of the largest non-nuclear explosions in world history.

2.      The Beirut Blast is estimated to have destroyed more than a quarter million homes, killed over 230 people, injured several thousands more, and left some 300,000 people homeless, including 80,000 children. The World Bank's assessment is that the explosion caused up to an estimated $4.6 billion in physical and related economic damages.

3.      That the company that chartered the ship carrying these explosives without proper authorization under Lebanese law is responsible for the natural and foreseeable consequences of transporting these explosives into Beirut on a unseaworthy ship is beyond reproach. Indeed, Lebanon has asked Interpol to arrest the Russian Ship captain, Boris Prokoshev, and Owner, Igor Grechuskin, a Russian businessman in Cyprus, alleging that they were criminally responsible for the explosion. But it is not just low-level individuals that bear blame for the blast. The seismic surveying company operating under a questionable Contract in a deeply corrupt political environment that decided to negligently charter a unseaworthy boat carrying explosives without

2

necessary authorizations in violation of its own Contract terms, local law, and best industry practice is ultimately responsible for the horrific explosion.

4.      Plaintiffs are among the victims of this carnage.

5.      This lawsuit is brought on behalf of U.S. citizens, a U.S. green-card holder, relatives of U.S. citizens, and others who were living near the Port of Beirut at the time of the Beirut Blast.  For nearly two years, Plaintiffs have watched helplessly as the same corrupt political environment in which the Beirut Blast occurred now delays justice for the victims indefinitely.

6.      The evidence uncovered to date makes clear that the seismic-surveying company, which either consciously participated in or knowingly turned a blind-eye towards the string of events that brought the ammonium nitrate to the port of Beirut, is responsible for selecting an unqualified subcontractor, selecting an unseaworthy ship loaded with ammonium nitrate to bring into the port of Beirut, and, ultimately, for the blast and the devastation it caused.  This seismic surveying company, which brought death and destruction to Beirut's doorstep, dealt with a corrupt regime as "the cost of doing business".

7.      The company was later acquired by Defendants, who maintain their operational headquarters in Houston, Texas, and who have assumed the company's liabilities.

8.      Plaintiffs come before this Honorable Court seeking to vindicate their rights and obtain some measure of recompense for the indescribable pain and loss they suffered as a result of the Beirut Blast.

## **DISCOVERY PLAN**

9.      Plaintiffs intend to conduct discovery in this case pursuant Rule 190.3 of the Texas Rules of Civil Procedure (Level 2).

## PARTIES

*Plaintiffs*

10.     Sarah Copland is an individual who resides in Australia and who resided in Beirut in or about August 2020.  Her two-year old son, a dual Australian–American citizen, died in the Beirut Blast.

11.     Mary Deville Cochrane is a U.S. citizen who since prior to August 2020 has resided with her immediate family in the Sursock Palace in Beirut, a Cultural Heritage Site.  Ms. Cochrane's 98-year-old mother-in-law—Lady Cochrane, or the "Queen of Beirut" Yvonne Sursock Cochrane—died as a result of injuries sustained during the Beirut Blast.

12.     Tania Daou is an individual who was in Beirut at the time of the Beirut Blast. Ms. Daou is a United States green-card holder and was married to Jean Frederic Alam, a U.S. citizen.  Ms. Daou was attending a doctor's appointment with her husband at Saint George's Hospital near the Port of Beirut during the Beirut Blast.  Mr. Alam perished during the blast.

13.     Ms. Daou's two sons, who lost their father Jean Frederic Alam in the blast, are both citizens of the United States.  Her eldest son, Cedric Ellis Alam, lives in New Jersey while her youngest son, Yann Victor Alam, is currently in the United States but will return to Beirut in the fall to complete his last year of high school.  He plans to return to the United States to attend college.

14.     Fouad Debs is a U.S. citizen who resides in Beirut.  Mr. Debs was commuting from his office in a neighborhood near the Port of Beirut to his home in the same neighborhood when the Beirut Blast occurred.

15.     George Cortas is a United States citizen born in East Lansing, Michigan.  He is a practicing gastroenterologist in Beirut, Lebanon.  He has worked at the Saint George University Hospital Medical Center for the last 13 years.  His duties include clinical practice where he sees

private patients, medical education of medical students, residency training of internal medicine residents, and gastroenterology training of gastroenterology fellows.

16.     Georges Juvelekian graduated with a Doctor of Medicine diploma from the American University of Beirut and completed a residency in internal medicine at the University of Rochester Strong Memorial Hospital in New York as well a fellowship in pulmonary, critical care and sleep medicine at the Cleveland clinic foundation in Ohio.  He is currently President of the Lebanese Pulmonary Society and head of the pulmonary, critical care, and sleep division at Saint George Hospital University Medical Center in Beirut, as well as an associate professor of clinical medicine at Balamand University, and acting associate Dean for academic affairs at Saint George University of Beirut (SGUB).  Dr. Juvelekian is a United States citizen.

17.     Asya El-Meehy is a United States citizen.  Having served as an assistant professor of comparative politics she has held positions at several universities in the United States, including University of California, Berkeley, Wesleyan University, and Arizona State University, Ms. El-Meehy resided in Beirut between December 2012 and August 2020.  She currently resides in California.

*Defendants*

18.     Defendant TGS ASA is a publicly traded, stock-based company formed under the laws of Norway.  TGS ASA resulted from a merger in 1998 between the former Tomlinson Geophysical Services Inc., which was founded in Houston, Texas, in 1981, and the former Norwegian Petroleum Exploration Consultants International ASA, which was founded in Oslo, Norway, in 1981.

19.     Today, TGS ASA's financial headquarters are located in Oslo, Norway, and its operational headquarters are located in Houston, Texas, located in Harris County.

20.     More specifically, Defendant TGS ASA's primary and wholly owned subsidiary, Defendant TGS–NOPEC Geophysical Co., is a Delaware corporation with its principal place of business in Houston, Texas.

21.     TGS employs approximately 450 employees worldwide and approximately 200 employees in Houston, Texas.

22.     According to its website, "TGS provides data and intelligence to companies active in the energy sector.  In addition to a global, extensive and diverse energy data library, TGS offers specialized services such as advanced processing and analytics alongside cloud-based data applications and solutions."

23.     In or about August 2019, TGS announced that it had completed its acquisition of nonparty Spectrum ASA ("Spectrum"), a UK company with an office location of Dukes Court, Duke Street, Woking, GU21 5BH, UK.  The transaction between TGS and Spectrum was a "statutory merger under Norwegian law."  As a result of this statutory merger, the surviving entity assumed all the merged entity's liabilities and obligations, including tort liability.  According to TGS's website, it continues to maintain an office location at Dukes Court, Duke Street, Woking, GU21 5BH, UK.

24.     Prior to the merger, Spectrum billed itself as "a major provider of Multi-Client seismic data and Seismic Imaging services to the global oil and gas industry," including in the "East Mediterranean."

25.     More specifically, Spectrum and its agents were operating in the Beirut area from approximately at least 2000 to 2013 pursuant to multiple contracts entered into with the Lebanese Ministry of Energy and Water.

*Relevant Non-Parties*

26.     Geophysical Services Center ("GSC") is a Jordanian company that Spectrum hired as a subcontractor for whom Spectrum was responsible.  GSC was essentially a shell company that operated out of a P.O. Box.

27.     The last agreement between the Ministry and Spectrum was signed in 2012 by Mr. Gebran Bassil—the then Lebanese Energy Minister—to conduct seismic surveys of the Lebanese territorial waters, including an onshore survey in 2013.  Minister Bassil is the leader of the Free Patriotic Movement (FPM), a major Lebanese political party which has controlled the Ministry of Energy continuously since 2011 and which was, and still is, allied with Hezbollah, a U.S. designated terrorist group.  On November 6, 2020, Mr. Bassil was sanctioned by the United States government under the Global Magnitsky Human Rights Accountability Act for his role in corruption in Lebanon.

## JURISDICTION & VENUE

28.     This Court has subject-matter jurisdiction over the action pursuant to § 24.007 of the Texas Government Code.

29.     This Court has personal jurisdiction over the Defendants pursuant to § 17.041– .045 of the Texas Civil Practice and Remedies Code.

30.     Venue is proper in this Court under § 15.002(a)(3) of the Texas Civil Practice and Remedies Code because Defendant TGS's global financial headquarters and principal office in the state is located in Harris County.

## RULE 47 NOTICE

31.     Plaintiffs seek damages in excess of $250,000,000.00.  However, as required by, and pursuant to, Rule 47 of the Texas Rules of Civil Procedure, Plaintiffs hereby provide Defendants notice that this is a cause of action that exceeds $1,000,000.00 in damages and is

within the Court's jurisdictional limits.  Furthermore, Plaintiffs demand judgment for all other relief for which Plaintiffs deem themselves entitled.

## FACTS

32.     The general story of the Beirut Blast as has been reported in the press has mostly focused on the movement of the ammonium nitrate that eventually exploded—to the exclusion of the more fundamental questions: why and how did it get there?  This Petition aims to answer these fundamental questions.

33.     On September 27, 2013, the Moldovan-flagged cargo ship *MV Rhosus* set sail from Batumi, Georgia, to Beira, Mozambique, carrying 2,750 tonnes (3,030 short tons) of ammonium nitrate.  The Rhosus was owned by a company based in Panama but was regarded by the captain as under the de facto ownership of Russian businessman Igor Grechushkin. The shipment had purportedly been ordered by an explosives manufacturing company for mining in Mozambique, Fábrica de Explosivos Moçambique (FEM).

34.     A joint investigation by Der Spiegel (Germany's largest news website) and the Organized Crime and Corruption Reporting Project concluded that FEM, which ordered the shipment, is 95-percent owned by the family of Portuguese businessman Antonio Moura Vieira, through a company called Moura Silva & Filhos.  Moura Silva & Filhos has previously been investigated for arms trafficking and supplying explosives used in the 2004 Madrid train bombings as well as for providing arms to Hezbollah.

35.     An additional report by Der Spiegel has uncovered that it was not Grechushkin who owned the *Rhosus* but rather Cypriot businessman Charalambos Manoli, who allegedly maintained a relationship with a bank used by Hezbollah in Lebanon.  This same report concluded that the Rhosus's owners owed €962,000 to FBME Bank.  FBME Bank was

8

sanctioned by the U.S. authorities under the USA PATRIOT Act for being a "financial institution of primary money laundering concern," including aiding Hezbollah (listed as a terrorist group by U.S. authorities) and a company linked to Syria's weapons of mass destruction program.  Der Spiegel found that the Rhosus might have been offered up as a collateral asset to the bank.

36.      In any event, on November 21, 2013, the ship made port in Beirut.  The mystery of its tragic arrival has led some sources to claim it was forced to port due to mechanical issues and possibly engine problems, while other sources claimed the owner did not have sufficient funds to pay tolls for transit through the Suez Canal and so attempted to take on a shipment of heavy machinery in Beirut.  What is unclear about these theories is that they ignore the fact that the Rhosus supposedly went to Beirut for the purported purpose of picking up seismic equipment that was being used by Spectrum under its Contract with the Ministry of Energy.  As noted previously, the vessel was not technically capable of undertaking this task.  When the heavy machinery was stacked on top of the doors to the cargo space containing the ammonium nitrate, the ship's hatches buckled, damaging the ship. After inspection by Port State Control, the Rhosus was deemed unseaworthy and forbidden to set sail. A crew formed of a mix of Ukrainian and Russian nationals was aboard.

37.      In a dramatic twist that further exposes the role of Spectrum in the tragic sequence of events, Grechushkin reportedly went bankrupt and, as the story in the press goes, after the charterers of the ammonium nitrate lost interest in the cargo, they abandoned the Rhosus.  The ship soon ran out of provisions and the remaining crew were unable to disembark due to immigration restrictions.  According to Lloyd's List, Port State Control seized the Rhosus on February 4, 2014, due to US$100,000 in unpaid bills.  The ship had

accrued port fees and been fined for refusing cargo.  Lawyers argued for the crew's

repatriation on compassionate grounds because of the danger posed by the cargo still aboard

the ship, and an Urgent Matters judge in Beirut allowed them to return home.  The crew had

been forced to live aboard the ship for about a year before repatriation.

38.     By order of a Lebanese judge, the Rhosus's cargo was brought ashore in 2014

and placed in Warehouse 12 at the port, where it remained for the next six years.  The Rhosus

sank in the harbor in February 2018.

39.     That the Rhosus, a suspicious and inadequate vessel carrying cargo of explosive

grade ammonium nitrate that had been used in the Syrian civil war raging next door, found

itself docked in the Port of Beirut in November 2013 was neither coincidence nor

happenstance.

40.     U.S. authorities had previously sanctioned individuals based on suspicion that

they were attempting to procure ammonium nitrate for delivery to Syria, including in the

same year that the Rhosus arrived in Beirut.  Also in 2013, the U.S. was engaged in talks to

disarm Syria of its chemical weapons cache.  The pattern and context laid out above

emphasizes just how reckless Spectrum was in chartering this particular vessel, which may

have been intentionally targeted to end up in Beirut with its deadly cargo while Spectrum was

used as a conduit to get it there.  Spectrum either knew this or was so reckless, indeed

willfully blind, in not knowing it.  Willfully blind so that it could continue its lucrative

relationship with corrupt politicians and officials.

41.     The explosive grade ammonium nitrate exploded on August 4, 2020, at around

6:00 p.m. following a fire that had erupted in the hangar where it was stored.

42.     On August 4, 2020, three workers reportedly did welding work on doors 3 and 11 in hangar 12 at around 4 p.m. and then went to another site to do repairs, leaving the port around 5 p.m.  A fire started about 50 meters from where the workers had been welding.

43.     Forensic Architecture mapped 243 bags of ammonium nitrate in bays 5, 6, 9, and 10 based on published photos and videos.

44.     The first video showing the fire at the port was uploaded to Twitter at 5:54 p.m. and Forensic Architecture has identified that it shows a smoke plume at the northeast corner of hangar 12.  Between 5:54 p.m. and 5:55 p.m. firefighters were alerted that a fire had broken out at the port but were not advised about the ammonium nitrate.  After arriving on the scene four minutes later, the firefighters called for backup as they tried to open the hangar but the fire set off explosions.  At 5:59 p.m. sounds of fireworks can be heard in videos shot of the hangar.  Another video taken from the Saint George Hospital shows a new "intense heat source" at 6:07 p.m. on the northwest side of the hangar followed by sparks and a large plume.

45.     Then at 6:08 p.m. a massive detonation took place creating a "large spherical plume" above the center of the hangar, suggesting an explosion that originated in one particular area of the hangar.

### Plaintiffs, Their Loved Ones, and Their Property

#### Sarah Copland and her son Isaac

46.     At the time of the explosion, Plaintiff Sarah Copland was in her fourth-floor apartment a short distance from the Port of Beirut.  She was giving dinner to her two-year old son Isaac when she heard the explosion.  She walked up to the window to see what was happening.

47.     As she walked back to her son who was sitting nearby on his high-chair, the second explosion hit.  Ms. Copland was thrown to the ground.  Isaac's high-chair was sent flying across the room.  Isaac was hit in the chest by a piece of glass.  Unbeknownst to Ms. Copland, who was pregnant at the time, she also had a large piece of glass in her face.

48.     Her husband who was in the bathroom when the blast hit, ran out calling their names.  Thinking that it was a terrorist attack, and fearing another explosion, they ran to hide in the bathroom.  It was there that Ms. Copland realized how much Isaac was bleeding.  She wrapped him in a towel and ran outside of their home.

49.     Once outside, Ms. Copland saw that the street was destroyed and people were lying on the ground covered in blood.  She flagged down a car and a man who was driving with his family drove them to the hospital.  On the way to the hospital, Isaac cried before becoming quiet, his father tried to keep him awake but Issac started fading.

50.     At the hospital, Isaac was taken to be treated.  As Ms. Copland was injured and pregnant, she was taken to another area as the doctors feared for her unborn child.  That was the last time that she saw her son Issac.  Issac was the youngest person killed in the blast.

51.     Ms. Copland's apartment was destroyed, including all of her and her family's personal belongings.

52.     After the blast, Ms. Copland and her husband moved to Australia.  She describes the loss of her son as feeling like a physical pain, almost like a part of her is missing.

*Mary Deville Cochrane*

53.     Plaintiff Mary Deville Cochrane was in her home near the Port of Beirut at the time of the explosion.  The Beirut Blast caused her significant physical and psychological

injuries.  Her home was substantially damaged.  Additional properties adjacent to her home owned by her family were also damaged as a result of the blast.

54.     Ms. Cochrane suffered a broken elbow, punctured lung, cracked ribs, various cuts caused by flying glass, and heavy bruising on her right leg, which still affects her today. Ms. Cochrane was in intensive care for days following the blast.

55.     Psychologically, as a result of the blast, Ms. Cochrane is affected by loud noises which she thinks are bombs exploding.  For example, since the Beirut Blast, when there have been fireworks at the Mar Mitr cemetery near her home, or when planes have flown low over her neighborhood, Ms. Cochrane has scrambled under her dining table for cover.  Others in the room during such instances—who did not experience the Beirut Blast— have not flinched upon hearing such noises.

56.     Ms. Cochrane also lost her mother-in-law, Lebanese philanthropist Lady Yvonne Sursock Cochrane, who died from injuries caused by the Beirut Blast. Lady Cochrane was 98 years old and known to some as "a queen of Beirut."  She dedicated her life to preserving Lebanon's cultural heritage and campaigning for the protection of culturally significant architecture, which she believed was threatened by government mismanagement and corruption.

57.     Apart from physical and mental suffering, Ms. Cochrane sustained extensive property damage to her home, the landmark Sursock Palace.  In fact, since the blast, Ms. Cochrane and her husband have not been able to live in their home due to the destruction. Rather, they live in the garden kiosk, a converted cottage.  The palace house has been lived in by five generations with four generations maintaining it and adding to its collection.  The inability to live in any part of the house has significantly impacted Ms. Cochrane.

58.     The 160-year-old Sursock Palace is a listed cultural heritage site and one of the most storied buildings in Lebanon.  The Palace sits on a hill overlooking the now-destroyed port.  It was built in 1860 by the Sursock family, traders in the Ottoman Empire.  Over the years it has served as a home for the family and a venue for events and visiting dignitaries.  It also houses a collection of cultural artifacts, works of arts, and antiquities collected by three generations of the Sursock Cochrane family.  Following Lebanon's civil war from 1975 to 1990 the Palace took 20 years to restore.  According to Ms. Cochrane's husband, the destruction caused by this explosion is far worse than that caused by 15 years of war.

59.     Repair and restoration work is required for, among other structural elements: the walls, windows, doors, roofs, and ceiling.  A conservative estimate for these repairs alone, not including repair and/or replacement of furnishings, exceeds $3 million.

60.     Repair or replacement of furnishings damaged during the Beirut Blast—such as upholstery and drapery, wood and metal furniture, paintings, tapestries, sculptures, chandeliers, carpets, ceramics and glass, art objects, and marble statues—will only add to the total.

*Tania Daou, her husband, and*
*her minor son Yann Victor Alam and her adult son Cedric Alam*

61.     Plaintiff Tania Daou and her husband Jean Frederic Alam, or "Freddie" as his family and friends called him, were attending a routine doctor's appointment for Ms. Daou at Saint George's Hospital, which overlooks the Port of Beirut.  Their two sons, Cedric Ellis Alam and Yann Victor Alam were at their home.  Ms. Daou and Mr. Alam were finishing the appointment around 6:00 p.m. local time when they heard a huge explosion.  From the hospital windows, they saw the smoke billowing from a hangar at the port.

62.     A second explosion threw Ms. Daou across the room, away from her husband, and knocked her unconscious for a few seconds.  She regained consciousness and called out to Freddie but he did not respond.

63.     When Ms. Daou reached her husband, she saw that he was lying on his stomach, covered with huge pieces of glass.  She tried to turn him over to clear his airway and saw that his throat was cut open from side to side.  Ms. Daou, covered in her own blood and her husband's blood, was unable to save him.  Mr. Alam died next to his wife.

64.     Prior to his death, Freddie Alam was 56 years old and in good health.  He was a highly successful businessman who had graduated from Columbia University in the United States, worked in the United States, Switzerland, and Lebanon, and started various companies of his own.

65.     Mr. Alam was a beloved husband and father.  His two sons, one in college and the other almost college-age, revered and admired their father.  Now they are left without a father, a mentor, and a best friend.

66.     For Ms. Daou, thinking about the devastating impact of Freddie's death on her and her children is overwhelming and extremely painful.  According to Ms. Daou, she lost a part of herself when her husband died next to her during the Beirut Blast.  Mr. Alam was the primary breadwinner for his loving wife and two teenage boys.  Cedric Ellis presently is in college in New Jersey and Yann is presently living in the United States before finishing his last year of high school in Lebanon after which he intends to return to the United States for college.

67.     With Mr. Alam's passing and Lebanon's economy in crisis with limited access to bank accounts, Ms. Daou struggles to maintain a reasonable standard of living.

*Fouad Debs*

68.     Plaintiff Fouad Debs was working at his law office in a neighborhood near the Port of Beirut.  Mr. Debs left work shortly before 6:00 p.m. local time and was headed to his apartment located in the same neighborhood.

69.     Shortly after 6:00 p.m., Mr. Debs was parking his car when he heard a very loud noise.  The car shook as if there had been an earthquake and debris from a nearby building fell onto the car.  Mr. Debs sped up the road, subsequently stopped, and exited the car.

70.     Mr. Debs observed orange and pink smoke and large piles of debris on the streets.  Numerous alarms rang out.

71.     Mr. Debs suffered severe psychological trauma.

72.     Mr. Debs's apartment suffered significant damages.

73.     The nearby law office where Mr. Debs works also sustained damage.  Most of the glass and aluminum frames were shattered by the Beirut Blast, as were the wooden shutters.  Many of the curtains were shredded.  Much of the office furniture and a big chunk of the parquet floor had to be fixed or replaced.  Two computers were damaged and three air-conditioning units were hit and had to be replaced.

74.     In several places inside the office chunks of concrete fell causing damage and most of the office had to be repainted because of the debris that flew into the walls.  The building elevator and the glass enclosing the staircase were also damaged.

75.     The debris that fell on Mr. Debs's car during the Beirut Blast included glass, aluminum, and stones.  Some parts of the car were bent and the left-side mirror was broken. The damage to Mr. Debs's car was not covered by insurance.

16

*Dr. George Cortas*

76.     Dr. Cortas was in his clinic at the Saint George Hospital University Medical Center seeing a patient when the explosion happened at 6:08 p.m.  Dr. Cortas suffered multiple injuries because of the explosion that not only included physical injuries but also emotional ones.

77.     After the explosion happened, Dr. Cortas fell unconscious in his clinic and so did his patient.  According to Dr. Cortas: "The patient gained consciousness before me and was able to seek help for us both.  When the physicians arrived to my clinic, they carried me to the reception on the ground floor of the hospital that was completely destroyed.  I was able to be transported to the Hotel Dieu hospital in Beirut, Lebanon.  I was transferred to the operating room where the physicians and the plastic surgeon started working on my multiple injuries trying to stop the bleeding that was occurring from my neck front and back, my right cheek, and my head.  My blood volume dropped about 50% from a hemoglobin of 15 to hemoglobin of 8 in one hour.  Multiple teeth were broken and my right jaw was also broken. The jaw was repaired by a maxillofacial surgeon and the bleeding was stopped by multiple stitches and staples.  I was discharged from the Hotel Dieu Hospital after four days.  The outpatient recovery occurred at my home surrounded by my family members and close friends.  Nursing staff attended to my multiple wounds over the next few weeks and follow up with multiple physicians also occurred.  In addition to that, in order to try to heal my emotional wounds and to prevent post-traumatic stress disorder, I went and saw a psychiatrist who prescribed medications for the next 6 to 8 months.  In addition to that, I saw a physical therapist for my jaw where I had multiple sessions, between 15 and 20, in order to revive the nerve that was damaged.  Twenty months after the injury and explosion, I have recently

regained partial function of my nerve on my right jaw.  At this point I still have only fifty percent function and still experience paresthesia.  The neurological damage is likely permanent."

*Dr. Georges Juvelekian*

78.     On August 4 at 6:07 p.m., Dr. Juvelekian was in his clinic finishing his patient records.  The last patient had left the office about ten minutes prior.  He does not recall the sound of the explosion.  He remembers looking at the glass and aluminum facade on his left and watching it rumble, then felt a crushing pressure, then nothing.  Dr. Juvelekian had passed out.  He does not know for how long he was unconscious but when he came to, he recalls getting up and walking towards the clinic door.  He could not see, he was shell-shocked.  As he would later be told in the ER by the head of the ER, the ER physician sat him down on a bench and tried to inspect a gushing wound on his left eyebrow.  The physician managed to clean up the wound and then one of the security guards put him in a van and took him to Mount Lebanon Hospital (MLH).  The only thought that kept running in his clouded head at the time was "I'm the head of the medicine department.  I'm the head of the pulmonary and ICU divisions at SGHUMC.  I'm in my hospital's ER.  Why am I being shuttled to another facility?"  He did not understand that Saint George's hospital had been completely destroyed in the blast.

79.     At MLH, he was sat on a chair next to a colleague who had sustained a leg injury.  Dr. Juvelekian was nauseated. He vomited pure blood.  He had been swallowing blood from his facial injuries and fractured face and the blood irritation to his stomach caused him to vomit repeatedly and continuously.

80.     While Dr. Juvelekian's scan was negative for an intracerebral bleed, he nonetheless sustained twelve facial fractures. Once back at home, Dr. Juvelekian experienced constant pain. Lying down was not feasible, because the blood oozing down would not allow it. He saw double. The blast and the left periocular injury had caused conjunctival bleeds and pushed his left orbit sideways. Dr. Juvelekian's wife had spoken to a close friend who at the time was the head of anesthesia at Bellevue Hospital. He arranged for a plastic surgeon to check his laceration and do proper reconstruction. While general anesthesia was preferable this was not an option since intubation contraindicated with his facial fractures. He was therefore forced to do the reconstruction surgery under local anesthesia. His eye was spared by less than 3 millimeters. For an extended period of time Dr. Juvelekian was unable to chew food and had to live on a fluid and puréed diet. Dr. Juvelekian reports that although almost two years have gone by it seems like yesterday and pain is still constantly present.

*Asya El-Meehy*

81.     Ms. El-Meehy was seriously injured on August 4, 2020, while working remotely from her apartment located on the 3rd floor of the Wave Building (Mar Mitr Street, Achrafieh), which was totally destroyed in the explosion. She suffered a fracture in her left tibia bone, heavy bruising in the right leg, and glass splinters in various parts of her body. After regaining consciousness, she attempted to escape the neighborhood on foot for two hours but was unable to walk. Two unknown young Lebanese women took her in off the streets where she stayed with their family for five days. On the night of August 4, 2020, the family transported her to three different hospital emergency rooms, which turned her away due to overcapacity. She did not receive a medical examination until the following day. Due to the collapse of four nearby hospitals and severe damage to more than 20 nearby primary

19

care facilities caused by the blast, widespread shortage in medical supplies, intermittent electricity, and COVID 19, Ms. El-Meehy had to be medically evacuated to Germany where she underwent surgery and several medical procedures as a result of injuries she sustained in the explosion.  Her home in Beirut had been her only domicile over the eight years preceding the explosion and as a result of the explosion she lost all of her material belongings, including furniture, appliances, clothing, and personal items.

### The Backdrop: Corruption in Lebanon

82.    Economic and financial corruption have long permeated the Lebanese political structure.  When it comes to governance, Lebanon lacks significant transparency, oversight, and accountability.  In 2018, Transparency International ranked Lebanon 138 out of 180 countries in its Corruption Perception Index.

83.    According to an April 2022 report authored by the United Nations Special Rapporteur appointed by the UN Human Rights Council, "Impunity, corruption, and structural inequality have been baked into a venal political and economic system [in Lebanon] designed to fail those at the bottom[.]"

84.    Due to widespread economic and political corruption and poor governance, Lebanon is today one of the most highly indebted countries in the world with one of the worst infrastructure and energy systems.

85.    National protests in the fall of 2019 roiled the country, creating a political crisis and prompting then-Prime Minister Saad Hariri to resign. The country's currency has lost 95% of its value, bank deposits have evaporated, and the economy has collapsed.

86.    Corruption and graft touch many aspects of Lebanese life, including in connection with the country's natural resources industry in which Spectrum is a participant.

20

87.     Lebanon aspires to become a major petroleum-producing country, like many of its wealthier neighbors in the region are.  One of the first steps in so becoming is to determine the location of potential oil and gas reserves by conducting seismic surveys.  Seismic surveys collect data to provide valuable information for companies looking to identify the location and volume of petroleum resources in the subsoil.  This initial step serves two purposes: it is not just the oil that has significant value but the seismic surveys themselves are sold for millions of dollars to oil and gas companies that wish to attempt to obtain contracts to extract the natural resources.

**Spectrum's Dealings with A Known Corrupt Regime**

88.     From approximately 2000 to 2014, Spectrum was engaged by the Ministry of Energy through a series of contracts to conduct seismic surveys of the Lebanese territorial waters, including an onshore survey in 2013.  The proceeds from the sale of seismic-survey data to third parties (for example, international oil companies bidding for the licensing rounds)—as well as the significant revenues expected to materialize if Lebanon eventually brings significant oil and gas production onstream—are supposed to be held and used for the benefit of the Lebanese public.

89.     In the early aughts and start of last decade, however, the legal apparatus for the nascent oil-and-gas exploration sector in Lebanon was poorly assembled and lacked oversight: an area where bad actors could take advantage of Lebanon's natural resources for their own personal benefit.  The Ministry of Energy has been the target of serious allegations of corruption and poor governance for decades.

90.     Joseph Maalouf, a former member of the Lebanese Parliament's Committee on Energy said in 2015, "Unfortunately, a lot of the corruption that exists in Lebanon has been ingrained in our social and political reality for decades."  Corruption within the Ministry of

Energy was endemic.  Maalouf was referring to the fact that since the end of the civil war in 1990, the Ministry of Energy has effectively abandoned its obligations to implement existing laws and has shown little intention of pursuing the state's claim to control and regulate the import dependent energy sector and its utility entity Electricity du Liban ("EDL"), which operates as a monopoly.  This has led to cartelization and political clientelism.

91.     Lack of transparency and regulatory control over the import of petroleum products, combined with costly financial subsidies and an artificially maintained currency peg has contributed to a plunder of the deposits in banks and the collapse of the economy. In April 2020, former Prime Minister Saad Hariri blamed former Energy Minister Bassil for overseeing the transfer of some $42 billion of state funds into the electricity sector (to cover the state utility company's repeated annual deficits, a public utility known for its inefficient and polluting operations while billing subsidised tariffs and depending on diesel and fuel oil imports). Notwithstanding this eye-popping amount of money moving from Lebanon's general coffers, people in Lebanon only receive EDL generated electricity a couple of hours per day.

92.     This environment of corruption and poor governance led to the cancelation of a loan from the World Bank for a dam construction, a massive fuel import scandal implicating high level officials in the Ministry of Energy, and judicial probes related to corruption, money laundering, and the suspicious procurement of power barges by the Ministry of Energy.

93.     Spectrum knew that it was entering into a contract with the Ministry of Energy in a highly corrupt, highly dysfunctional state.

94.     Nevertheless, the Contract was procured in a manner and contains financial terms that are inconsistent with the standards of the industry and accepted practices aimed at avoiding violation of various anti-bribery laws.

*Suspicious Procurement Process and Financial Terms of the Contract*

95.     The legal framework for the nascent oil and gas exploration sector in Lebanon was poorly assembled, lacked oversight, and became an area prone to various corruption schemes.

96.     Upon closer inspection, and viewed in context, there are too many anomalies for them to make any sense except as being part of a corrupt arrangement, procured by bribes and illegal profit sharing with government officials involved in this single sourced procurement and opaque award terms.  Certainly, the benefit to the Lebanese people remains dubious.  But much of the money being generated from these contracts was never audited nor transparently accounted for.

97.     Spectrum's relationship with the Ministry of Energy must have been very lucrative for Spectrum, which may explain why the company agreed to be party to a contract that was procured in a manner that lacked the level of transparency and oversight that's consistent with the standards of the industry and accepted practices aimed at avoiding violation of various anti-bribery laws.

98.     Furthermore, and most unusual, the 2012 Contract is entirely silent on key monetary terms, making it impossible to verify the revenues that have been generated and how they have been allocated between Spectrum and the Lebanese government.  This is unusual considering that Spectrum was effectively proposing to front all expenditures on behalf of the Lebanese government without ensuring that its rights to cost recovery and profits were clarified in the Contract.  These types of contracts have been associated with corruption cases in countries with poor governance systems as a form of bribery.

99.     While the actual contract at issue here is inexplicably silent on the key monetary terms, César Abi Khalil, a former Energy Minister, publicly stated that prior to 2010, contracts

between the Lebanese government and private seismic-survey companies provided that 80% of the revenue generated from the sale of survey data was set aside for the companies while only 20% went to the government.

100.     While it is unclear exactly how much money Spectrum was paid under this contract, we do know per Lebanese Petroleum Administration reports, that the Lebanese government's share of the accumulated revenues from sales of survey data totaled $43.03 million as of October 2019.

101.     If the $43 million currently held by the Lebanese government represents a 20% share of the revenue, then the total paid to Spectrum could exceed $175,000,000 based on the 80/20 profit sharing split that a former Lebanese Ministry of Energy said was agreed to in previously signed contracts of this type.

102.     However, the bank account where the Lebanese government's share of such revenue is held remains shrouded in secrecy.  Under Lebanon's Offshore Petroleum Resource Law, the net proceeds collected by the Lebanese government from petroleum-related activities are supposed to be deposited in a designated sovereign fund.  Since the sovereign fund stipulated upon in the Offshore Petroleum Resources Law was not created by virtue of an executive law, these returns should have been legally deposited in the State Treasury.  Instead, and according to independent NGO Lebanese Oil & Gas Initiative (LOGI), in 2012 the Council of Ministers adopted a resolution stating that returns generated by the sale of seismic surveys are to be transferred to a special account in the Central Bank under the signatures of the Minister of Energy and Water and the Director General of the Oil facilities in Lebanon.  The accumulated revenues, nonetheless, have been deposited in an account at the Lebanese central bank under the

signature of the Minister of Energy and the Director of the Oil Installations of Lebanon, Mr. Sarkis Hleiss.

103.    Much of the money generated from these contracts was never officially accounted for by the Ministry of Energy, notwithstanding questions put to it by organizations such as LOGI.  This raises serious suspicions about the nature of this single source procurement.

104.    More recently, Mr. Sarkis Hleiss has been summoned to appear in court by Lebanese judges investigating a multi-billion-dollar oil corruption scheme that took place over the same period of time as the Spectrum–Energy Ministry dealings.  He refused to appear and appears to have been on the run for the last couple of years.

105.    In other words, the funds that were supposed to be paid to Lebanon from revenues generated through the various Spectrum contracts were not paid to the Lebanese state treasury but to a special account controlled by then-Minister Bassil and by Mr. Hleiss.

106.    Mr. Bassil, the Minister of Energy at the time the Contract was executed, was designated by the United States Government under the Global Magnitsky Human Rights Accountability Act for "his role in corruption in Lebanon."  The U.S. Treasury Department press release explained: "Bassil has held several high-level posts in the Lebanese government, including serving as . . . the Minister of Energy and Water, . . . and Bassil has been marked by significant allegations of corruption."

107.    The press release continued: "In 2014, while Minister of Energy, Bassil was involved in approving several projects that would have steered Lebanese government funds to individuals close to him through a group of front companies."  Then-U.S. Secretary of Treasury Steve Mnuchin remarked: "The systemic corruption in Lebanon's political system exemplified

by Bassil has helped to erode the foundation of an effective government that serves the Lebanese people."

108.    Upon the conclusions of its investigative research, LOGI recommended: (i) executing an audit of the bank account containing these returns by an international and independent auditing firm to vet the deposited incomes and their sources and to verify the spending of any funds deposited in such account, (ii) elaborating a law prohibiting the use of these returns to prevent their spending until the creation of the Sovereign Fund stipulated upon in the Offshore Petroleum Resources Law, and (iii) publishing the conventions by virtue of which the Lebanese State is collecting a share from the sale of seismic data.

109.    Again, it is against this backdrop that Spectrum was operating under the 2012 Contract. At some point in the late summer of 2013 Spectrum was required to pick up seismic equipment, which included 4-5 vibrator trucks and was estimated to weigh 160 tonnes as detailed above. To conduct this work, Spectrum purportedly needed to charter a cargo ship to transport the equipment.

***Spectrum's Suspicious Selection of Subcontractors and Agents***

110.    Letters from Minister of Energy Bassil to Lebanese customs officials note that Spectrum had subcontracted "GSC," or Geophysical Services Center, a Jordanian company, to move the surveying equipment back to Jordan, since the equipment was purportedly owned by GSC Jordan.

111.    Pursuant to the Contract with the Ministry of Energy, Spectrum was to act as a commercially prudent operator in compliance with the American Petroleum Institute and the International Association of Oil and Gas Producers guidelines.

112.    GSC Jordan, however, appears to be a sort of shell corporation that does not have any employees or substance.  Spectrum subcontracted with GSC Jordan, a suspicious company, without performing sufficient due diligence as to GSC Jordan's ability to fulfill its obligations. As detailed more fully below, Spectrum had a duty to select contractors that were capable of doing the work assigned and its failure to recognize that the Jordanian company was not a reputable geophysical services company, but rather a corruption conduit, reflects a profound failure of its obligations.

113.    Spectrum was obligated to ensure that the contractor provided local knowledge and expertise. Spectrum should have been fully aware of all the appropriate regulations and requirements relating to port, area, and sector in which it was operating.

114.    Since its selection by Spectrum as a subcontractor, GSC Jordan seems to have remained "dormant" while retaining "active" status in the commercial registrar.  A link given for the GSC Jordan website shows an expired domain and in its place links for "related" topics such as Moroccan Argan Oil.

115.    GSC Jordan was set up by members of the Samara Family and former members of the Natural Resources Authority—a Jordanian State-owned entity operating under the Ministry of Energy and Natural Resources of Jordan.

116.    Although GSC Jordan advertised several partnerships, the only purported purpose for doing so was to give the appearance of tangible activities.  GSC Jordan was merely "assisting" foreign companies in their dealings with the Jordanian Ministry of Energy.  Put differently, it was a classic intermediary acting as a go-between company in state-related oil deals, commonly used in Africa and the Middle East.

117.    GSC Jordan is 100% held by Geophysical Services Company (UK) Ltd ("GSC UK"), a company registered in the UK.

118.    GSC UK does not have offices.  It operates from a virtual P.O. Box.

119.    From the public filings register of GSC UK, it appears the company was initially a family shell company established in 2008 by its appointed chairman, Mr. Issam F. Samara, a Jordanian national, to undertake "potential future contracts with other companies e.g. Tatneft Corporation, Russia and Petrel Resources."  While it remained formally "dormant for the next year," at the time, Tatneft had a contract with Syria's state-owned General Petroleum Corporation, which is on an EU sanctions blacklist.  This information was or would or should have been known to Spectrum before it selected a subcontractor.

120.    On December 2011, Company House, the UK registrar of companies, issued a strike-off notice to GSC UK and gave the company three months to remedy cause.

121.    While GSC UK did remedy cause, on January 6, 2012, GSC UK filed its full accounts with the inclusion of a statutory audit (Section 449 of the Companies Act 2006), including a qualified opinion by its independent auditors.  The opinion includes a footnote: "Matters on which we are required to report by exception" and "as explained above, our opinion is qualified in respect of investment valuation, as no details have been made available in respect the valuation, in our opinion we have not received all the information and explanation that we consider necessary for the purpose of our audit."

122.    On December 27, 2012, GSC UK filed its unaudited 2011 returns and reported a loss of GB£ 16,110,001 with the following note: "The Directors are of the opinion that the value of the investments in subsidiary has diminished and is impaired accordingly in the accounts at the year end."

123.    Spectrum could have selected one of the numerous qualified subcontractors who operate or operated in the region.  Many of those are present in Egypt, Turkey, Oman, Saudi Arabia, or the UAE.  Among those companies are WesternGeco and CGG Veritas, which described itself in its 2011 management report as "one of the main land seismic acquisition worldwide contractors especially in North America and the Middle-East."  Instead, Spectrum subcontracted with GSC Jordan, a suspicious shell company.

124.    According to Minister Bassil's personal lawyer speaking on record during an interview on local TV, it was Spectrum who subcontracted the movement of machinery and "as for the dates and mechanism of the equipment's entry and exit, they were set by the marine and land agent for the company in question, without the Ministry of Energy having any role."

125.    But in fact, Minister Bassil seemed to have taken an active role in the equipment port admission process as he signed a letter addressed to the Customs authorities in Lebanon on September 6, 2013, requesting that the machinery be allowed temporary admission in Lebanon, "based on the requirements of public interest" "for the purpose of implementing the Contract with Spectrum."

126.    A similar letter was sent by Minister Bassil to the Customs authorities six months earlier on February 13, 2013, which also reflects Minister Bassil's involvement.  Both letters list GSC Jordan as a subcontractor to Spectrum.

*Spectrum's Responsibility for Selecting The Rhosus*

127.    According to the ship's captain, Boris Prokoshev, the Rhosus docked in Beirut after Igor Grechushkin, a Russian national described by him as the ship's owner or operator, ordered him to make a last-minute stop in Beirut to pick up additional cargo to be used to pay for passage through the Suez Canal.  The additional cargo was Spectrum's seismic survey equipment via GSC Jordan which included at least four to five vibrator trucks with related hardware and

was estimated to weigh up to 160 tonnes.  It was to be taken from Beirut to Jordan. Spectrum was responsible for overseeing this work as part of the Contract.

128.    The actual orders appear to have started when a Jordanian named Mohamad Hantas, on behalf of Spectrum's subcontractor GSC Jordan, contacted a Lebanese maritime agent, Mustafa Baghdadi.

129.    Hantas specifically instructed Baghdadi to charter the Rhosus and requested that he act as agent for the Rhosus at the Port of Beirut.

130.    Bhagdadi undertook all formalities for the Rhosus's entry to the port.

131.    The Rhosus is what is known as a "garbage ship," a ship which does not comply with international safety regulations and most of the time carries low value-added cargoes.

132.    Built in 1986, the Rhosus was very well known by the port authorities of the region, stretching between the Black Sea and the Mediterranean, its preferred operating area. Each time it announced itself, a red flag was instantly displayed on the controllers' screens.

133.    Between 2008 and 2013, no less than 31 controls were carried out onboard.  The ship had been detained eight times by port authorities in Algeria, Bulgaria, Romania, Turkey and Ukraine, and even in Lebanon; in June 2013, in Sidon, the authorities demanded repairs for 17 failures.

134.    International law requires every merchant ship to be registered in a country.  The country in which a ship is registered is its flag state, and the flag state gives the ship the right to fly its civil ensign.  A ship's flag state exercises regulatory control over the vessel and is required to inspect it regularly, certify the ship's equipment and crew, and issue safety and pollution prevention documents.

135.    A ship owner may choose to register a ship in a country different from where the owner is located for reasons such as tax avoidance, the ability to avoid national labor and environmental regulations, and the ability to hire crews from lower-wage countries.

136.    The Rhosus was registered in the land-locked Eastern European country of Moldova, a jurisdiction different from where the ship's owners were located and one that is notorious for lax regulations for transparency, safety, and crewing of vessels registered there. Indeed, Moldova is included on the "Black List" of the Paris Memorandum of Understanding (MoU) on Port State Control due to poor performance.  Registering in such a country is known in shipping parlance as flying under a "flag of convenience."

137.    Under the flag-of-convenience system, ship owners and operators often pay—and largely fund—the same organizations that are supposed to regulate them.  Such ship registries typically have little capacity to systematically investigate crimes or deficiencies on vessels.

138.    Regular changes of flags were another reason for concern.  The ship had successively flown the flags of Panama, Georgia, and then Moldova: the last two flags were on the gray and blacklists.  "Typically, this is the kind of garbage ship you go to when the only determinant is the cost of transportation," a marine expert said.

139.    The ownership of the Rhosus is extremely opaque.  Among other things, a charter company called Teto Shippings, based in the Marshall Islands, seemed to have been acting in parallel with a Cyprus based shipping magnate called Charambolos Manoli, believed to be the ultimate owner, hiding behind another front, the Panama based company Briarwood Corp.  The latter was in active business with FBME bank, which was sanctioned by the U.S. authorities under the USA PATRIOT Act for being a "financial institution of primary money laundering

concern," including aiding Hezbollah (listed as a terrorist group by U.S. authorities) and a company linked to Syria's weapons of mass destruction program.

140.     Its opaque ownership structure and historical deficiencies, however, are a mere backdrop to the most immediate issue.  By no later than September 2013, the Moldovan-flagged Rhosus was in poor condition and suffering from numerous deficiencies that made it unseaworthy, a point which either must have been known or should have been known to Spectrum and its subcontractor.

141.     Indeed, glaring physical issues with the Rhosus had been documented by Lebanese authorities just a few months prior in the summer of 2013 when the vessel entered Lebanon's southern port of Sidon.  At the time, the Rhosus was found to have 17 deficiencies, including inoperative emergency alarms and signals, a poorly maintained auxiliary engine, leaking machinery, hull corrosion, poor working and living conditions, defects in rescue boats, missing gauges and thermometers, and outdated nautical publications.

142.     A month later, following an inspection in Spain, the vessel was held for nearly two weeks, revealing that defects identified in Sidon were most likely left unaddressed.

143.     When it left the port of Batumi in Georgia, the Rhosus was in extremely poor shape.  The decks were corroded, it lacked auxiliary power, and had problems with radio communication.  On the way to Lebanon, on October 3, 2013, it had to stop at Tuzla, Turkey, a major ship repair port.

144.     The selection of the Rhosus put in context of the subsequent events that unfolded from the day of its arrival in Beirut suggests that there was never any intention to load the seismic equipment onto it in November of 2013.  Experts have noted that the Rhosus was not a

"roll-on/roll-off ship," and therefore could not have been used to transport vehicles without extreme difficulty.

145.     Additionally, the ship was already carrying a load significantly larger than its capacity, largely on account of the 2,750 tonnes of ammonium nitrate.  Adding another 160 tonnes of heavy seismic machinery did not make any sense.

146.     While attempting to load the cargo, the ship's hatches covering the ammonium nitrate began to buckle under the cargo's weight because the ship's maximum capacity had already been exceeded.  When the ship docked in Beirut's port, it was found not seaworthy. In suspicious timing, outstanding debts emerged against the ship, causing it to be impounded by Lebanon's Enforcement Department on December 20, 2013.

### Suspicious Ownership of the Ammonium Nitrate Cargo

147.     A copy of the sales contract reviewed by journalists shows that the intermediate buyer of the ammonium nitrate was a commodity trading firm called Savaro Ltd., registered in London.  The contract lists the purchase date as July 10, 2013, when the Syrian civil war was at its peak.

148.     The United Kingdom's Companies House registrar reveals that Savaro's addresses are shared by properties previously owned or operated by the Syrian businessman George Haswani and brothers Mudalal and Imad Khuri, all three of whom are dual Syrian–Russian nationals.  According to the U.S. Treasury Department, Mudalal Khuri attempted to supply ammonium nitrate to Syrian President Assad's regime in 2013, and his brother Imad was later sanctioned for aiding such activities.

149.     The ultimate ownership of the ammonium nitrate cargo remains a mystery.

150.     Notably, on June 24, 2022, the UK's High Court of Justice in London ordered Savaro to "reveal its owners" as part of a lawsuit filed by the Beirut Bar Association.

151.     In the middle of September 2013, following reports of Assad using chemical weapons on his own citizens, including the Ghouta Chemical Weapons Attack on August 21, 2013, the United States and Russia reached an agreement that called for Syria's arsenal of chemical weapons to be removed or destroyed by the middle of 2014 and indefinitely stalled the prospect of American airstrikes.

152.     Around this same time, on or about September 23, 2013, the Rhosus departed Batumi, Georgia, ostensibly *en route* to Fábrica de Explosivos de Moçambique ("FEM"), a factory in Mozambique that produces commercial explosives.

153.     FEM is part of a larger network of companies connected to Mozambique's ruling elite, and in the past such companies have been investigated for illicit arms trafficking and supplying explosives to terrorists.  Moura Silva & Filhos, S.A. was previously investigated for allegedly supplying explosives used in the 2004 train bombings in Madrid that killed almost 200 people.  The following year, after receiving a tip from Spanish authorities, Portuguese police raided four warehouses belonging to the company, seizing 785 kilograms of explosives allegedly concealed from its inventory system.

154.     After the Rhosus was impounded, FEM—the purported purchaser of the ammonium nitrate located in Mozambique—never claimed the cargo nor sought a refund.

**Dangers of Ammonium Nitrate**

155.     The Rhosus's bill of lading issued on September 23, 2013, in Batumi, Georgia, identified the goods on board as 2,750.4 tonnes of high-density ammonium nitrate IMO 5.1 in 2,750 "big bags."  IMO 5.1 is a hazard classification under the International Maritime

Organization shipping standards.  The Rhosus's cargo manifest, dated September 27, 2013, included the same description of the goods.  As per applicable regulations, the Rhosus's net tonnage should not have exceeded 964 tons, but it significantly exceeded this weight even before arriving in Beirut to purportedly onload another 160 tonnes of heavy seismic machinery.

156.    Ammonium nitrate is an odorless, crystal-like white solid made in large industrial quantities.  The chemical is synthetic: the result of reacting ammonia with nitric acid.  Ammonium nitrate is a significant component of explosive mixtures used in mining, quarrying, and civil construction.  It is also the major constituent of ammonium nitrate/fuel oil or "ANFO," a widely used bulk industrial explosive.

157.    Not surprisingly, there have been several accidental explosions involving ammonium nitrate resulting in significant damage and loss of life since the beginning of the 20th century.  In 1921, about 4,500 tonnes of ammonium nitrate caused an explosion at a plant in Oppau, Germany, killing more than 500 people and injuring about 2,000 more.

158.    The deadliest industrial accident in U.S. history occurred in 1947 at nearby Galveston Bay, Texas, also known as the "Texas City disaster."  At least 581 people were killed during the Texas City disaster when more than 2,000 tonnes of the chemical detonated on-board a ship that had docked in the port.

159.    More recently, an explosion involving ammonium nitrate and other chemicals killed 173 people in the port of Tianjin, China, in 2015.

160.    Apart from industrial accidents, ammonium nitrate has also been a key ingredient in some of the world's most notorious terrorist attacks, including the bombing of the Oklahoma City federal building in the United States in 1995 and the bombings of the U.S. Embassies in Tanzania and Kenya in 1998.

161.     The chemical has also been used frequently by militants in the Middle East, including as a battlefield weapon in Syria and Iraq.  Indeed, ammonium nitrate has frequently been used in "barrel bombs," which are made by filling oil drums with explosives and dropping them from high altitudes.  Such bombs have been particularly prolific in the Syrian Civil War. The Syrian Network for Human Rights estimates that, since 2011, the regime of Syrian President Bashar al-Assad has dropped close to 82,000 barrel bombs, killing 11,087 civilians (1,821 of whom were children).

**The Rhosus Arrives in the Port of Beirut**

162.     According to the Rhosus's captain, Boris Prokoshev, after departing Georgia and while *en route* to Mozambique, the ship was ordered to make a last-minute stop in Beirut to pick up additional cargo, that is, the seismic survey equipment that had been used by Spectrum. Prokoshev is on record saying that there was never adequate space to load the heavy seismic equipment and, therefore, the order to load the machinery made no sense.

163.     The Rhosus arrived in the Port of Beirut in or about November 2013.

164.     The maritime agent arranged by GSC Jordan identified the Rhosus's cargo on the transit manifest it prepared on November 16, 2013, as "2755.500 [metric] tons of High-Density Ammonium Nitrate."

165.     Under Lebanese law, Article 17 of the Weapons and Ammunition Law, the importation of ammonium nitrate containing more than 33.50% nitrogen—such as the ammonium nitrate aboard the Rhosus—requires prior authorization from the Lebanese Ministry of National Economy, after the approval of the Ministry of National Defense (Army Command) and the approval of the Council of Ministers.

166.     Legislative Decree 137/1959 (also known as the Weapons and Ammunition Law) places restrictions on the procurement, assembly, trade, and possession of military equipment, weapons, ammunition, and explosives in Lebanon.  Ammonium nitrate with a nitrogen grade of 33.5 percent or more is covered by the decree as another form of gunpowder and explosive material and, as such, its procurement, assembly, trade, and possession in Lebanon is restricted. According to Lebanese customs officials, the ammonium nitrate stored at the port had a nitrogen grade of 34.7 percent.

167.     Under the Weapons and Ammunition Law, regulatory and supervisory tasks related to it are entrusted to the Ministry of Defense, the Ministry of Interior, and Army Command. The law states that the import, export, and re-export of military equipment and ammunition, including ammonium nitrate with a nitrogen grade above 33.5 percent, is subject to prior authorization from the Ministry of Economy after the approval of the Army Command and the Council of Ministers.  Additionally, the Directorate of Equipment under the Lebanese Armed Forces must inspect explosive and chemical substances that arrive to the country through its ports of entry, including sea, land, and airports.

168.     Spectrum and/or its agents knew or should have known of this legal obligation, and yet failed to obtain any prior approval before chartering the Rhosus and causing it to enter the Port of Beirut without the necessary approval from Army command.  Indeed, no such approval was either requested or obtained.  As such, the Rhosus entered the Lebanese territorial waters and the Port of Beirut in clear violation of Article 17.

***Spectrum's Operational Standards***

169.     Additionally, Spectrum was aware of and obligated to abide by the Recommended Practices for Oilfield Explosives Safety issued by the API (Exploration and Production

Department), the Dangerous Goods in Harbour Areas Regulations, and the API standards for Safe Offshore Operations.  Spectrum or its agent's selection of the Rhosus violated each of these regulations.

170.     The Contract, formally called the Non-Exclusive Multi-Client Contract for Acquisition Processing, Marketing and Licensing of Seismic Data in the Territorial and Exclusive Economic Zone and the Onshore of the Lebanese Republic Between the Ministry of Energy and Water acting on behalf of the Government of the Lebanese Republic and Spectrum GEO Ltd. (the "Contract" or the "2012 Contract"), listed the terms entered into between Spectrum GEO Ltd. and Lebanon but did not include any pricing terms.

171.     While the Contract's terms and the international shipping standards incorporated into the Contract include technical language, the gist of Spectrum's obligations are that it was required to select any subcontractors with care and due diligence to ensure that they could safely do the work they were hired to do, and that Spectrum was responsible for the failures of its subcontractors if Spectrum failed to perform under the international standards set forth in the Contract.  Spectrum, of course, is also bound by the tort and civil laws of the countries in which it operates, specifically Lebanon.

172.     Spectrum's business model was based entirely on subcontracting out the seismic data acquisition.  Indeed, David Rowlands, former Senior Vice President of Spectrum, noted in an interview with a reporter, weeks after the Beirut Blast: "At Spectrum we don't acquire seismic data; we subcontract that service to other companies."  As a result, Spectrum was all the more familiar with its obligation to properly vet subcontractors and properly oversee their work—it was the entire basis of its business model.

173.     The terms of the Contract signed by Spectrum and the Ministry of Energy have remained hidden from public view up until the filing of this Petition, copies of it being obtained during Plaintiffs' investigation.  The 2012 Contract provided in part: "Spectrum Shall: act as a reasonable prudent operator in accordance with the highest standards in the international industry; and maintain adequate insurance for all foreseeable risks, including without limitation, against third party damage, pollution, marine and hull."  Relevant international standards include guidance issued by entities such as the American Petroleum Institute ("API") and the International Association of Oil and Gas Producers ("IOGP").

174.     The Contract language expressly incorporates the standards set forth in the API and the IOGP and required Spectrum to comply with these international standards.

175.     A 2020 study, "API Standards: International Usage and Deployment," noted that "API standards are widely recognized and are used actively around the globe."  It also noted: "The widespread use of API standards across all markets examined demonstrates the extent to which regulators and companies rely on them to enhance environmental, health, safety, and worker performance while stimulating economic growth, technology development, and trade, in accordance with good regulatory practices.  They are key to the global energy sector, streamlining regulation across borders, and minimize economic inefficiencies."

176.     The third edition of API Recommended Practices ("API RP") 75 states that it does not require contractors to develop a Safety and Environmental Management Program ("SEMP") but that contractors (and subcontractors) be familiar with the operator's SEMP.  The central guidance issued in the third edition of API RP 75 is that (1) when selecting contractors, operators should evaluate information regarding the contractor's safety and environmental policies and practices (and cross referencing API RP 76); (2) the operators should communicate

its safety expectations to contractors and identify specific requirements; and (3) Appendix A explicitly covers contractors selection processes, seen as a "major step in achieving acceptable contractor performance" (and cross referencing APR RP 76).

177.    Spectrum was also contractually obligated to comply with API RP 76, Contractor Safety Management for Oil and Gas Drilling and Production, 2d 2007.  This section is intended by the API to assist operators, contractors, and subcontractors in the implementation of a contractor safety program and improve the overall safety performance and expressly relates to contractor selection.

178.    The central guidance set out in API RP 76 is: the operator should identify the safety requirements and communicate these to the contractor; contractors have the responsibility to provide appropriate training of employees to ensure safety; training programs should be made available to the operator and retained by the contractor; hazards should be identified to employees, and this is considered the responsibility of both the operator and contractor.

179.    Critically, this section instructs that "when selecting a contractor, operators should ask contractors to submit specific safety and training information as part of their selection process."

180.    The third edition of API Std. 2220 was promulgated in October 2011 and, on information and belief, was in force when Spectrum subcontracted with GSC Jordan.  This section sets forth standards to assist operators and contractors in developing, improving, and maintaining mutual safety programs.  It states that a comprehensive contractor health and safety program should contain a written plan identifying specific procedures and responsibilities, monitoring procedures, and a system for feedback and improvement.

181.    Operators should have a defined mechanism to pre-qualify contractors for consideration for work and, before a job, should ensure that the contractor is familiar with the work, facilities, hazards, and requirements.  Operators should set out safety expectations in the bid package and make the contractor aware of them before awarding the job.  A contractor's safety program should be at least as robust as the operator's, and evaluating the contractor's safety information is a "major step" towards obtaining safe contractor performance

182.    The Section further adds that while the work is being completed, the operator should monitor the contractor's activities and evaluate health and safety performance.  The operator should periodically review the work site to verify the contractor's compliance with safety rules.  The contractor itself should also independently manage safety, report accidents to the operator, and conduct its own safety inspections.

183.    IOGP 423 is a best practice note relating to contract management and subcontractors.  It requires that operators assess the sources and types of risks that are involved in all phases of the project and share these with the contractor.  The operator and contractor should then undertake a joint risk assessment and evaluate the contractor's ability to complete the project while managing the risks.  During the project, the operator should continuously review the risks and control barriers.

184.    Oil & Gas UK ("OGUK") is a not-for-profit organization and the leading representative body for the UK offshore oil-and-gas industry.  OGUK publishes guidance to oil-and-gas operators that can be considered part of the standard for performing as a "reasonably prudent operator," as Spectrum was required to act.  OGUK's principles stress the importance of maintaining process safety by ensuring that appropriate resources are made available and that a proper safety program is developed by senior management.

185.    The International Standards Organization ("ISO") is an international nongovernmental organization with a membership of 165 national standards bodies.  It produces some of the best-known and most widely used standards, which include standards in the area of environmental protection, health, and safety.

186.    Moreover, IBC Code - 2004 Amendments to the International Code for the Construction and Equipment of Ships Carrying Dangerous Chemicals in Bulk (IBC Code) provides an international standard for the safe carriage by sea of dangerous and noxious chemicals in bulk. To minimize the risks to ships, their crews and the environment, the IBC Code prescribes the design and construction standards of ships involved in the transport of bulk liquid chemicals and identifies the equipment to be carried to minimize the risks to the ship, its crew, and to the environment with regard to the nature of the products carried.  In practice, the IBC Code is primarily intended to assign, to each vessel, one of the ship types according to the degree of the hazards of the products carried by such ships. It is particularly relevant for products which may have one or more hazardous properties, including flammability, toxicity, corrosivity and reactivity, as well as the hazard they may present to the environment. The IBC Code addresses inspection procedures prior, during, and after loading of the products.

187.    Ammonium nitrate is listed as a product subject to IBC Code and is listed in the Index of Products Carried in Bulk at Chapter 19. The IBC Code applies to the carriage of both bulk cargoes of dangerous chemicals or noxious liquid substances (NLS), other than petroleum.

188.    SOLAS Chapter VII - Carriage of dangerous goods (SOLAS) and MARPOL Annex II Chemicals which are carried in packaged form, in solid form or in bulk are regulated by Part A of SOLAS Chapter VII - Carriage of dangerous goods, which includes provisions for the

classification, packing, marking, labelling and placarding, documentation, and stowage of dangerous goods.

189.   MARPOL Annex III sets out regulations for the prevention of pollution by harmful substances in packaged form and includes general requirements for the issuing of detailed standards on packing, marking, labelling, documentation, stowage, quantity limitations, exceptions, and notifications for preventing pollution by harmful substances. For the purpose of Annex III, "harmful substances" are those identified as "marine pollutants" in the International Maritime Dangerous Goods (IMDG) Code, which was developed by IMO as a uniform international code for the transport of dangerous goods by sea.

***An Ammonium Nitrate Explosion Rips Through Beirut***

190.   On August 4, 2020, the ammonium nitrate the Rhosus had transported to Beirut detonated, causing one of the largest nonnuclear explosions in history.  The blast, which could be felt on the island of Cyprus over 150 miles away, created a massive crater at the Port of Beirut and ravaged large swathes of the city, killing approximately 230 people, injuring approximately 6,000 more, and causing property damage for hundreds of thousands.

191.   The human toll of the Beirut Blast has been devastating.  Apart from the hundreds of innocent people who lost their lives during the blast, including at least three children under the age of 15, others of the 6,000 or more who were injured continue to suffer from physical and mental injuries sustained that day.  For example, on September 28, 2021, Ibrahim Harb—a 35-year-old accountant—succumbed to critical injuries sustained 14 months earlier during the blast. Others are likely to suffer from long-term physical impairments as a result of the explosion.

192.   The Beirut Blast's impact on the mental health of survivors has also been significant.  Embrace, a leading organization providing mental health services in Lebanon,

reported that its emotional support and suicide prevention hotline received more calls between August and November 2020 (immediately following the Beirut Blast) than in all of 2019. Embrace surveyed 903 men and women between the ages of 18 and 65 shortly after the blast and found that 83% of respondents felt sad almost every day and 84% felt extra sensitive to loud noises.

193.    The unexpected nature of the Beirut Blast was particularly traumatic for survivors.  As one victim explained: "We were sitting in our home, they killed us in our homes, we didn't do anything to deserve this.  We weren't expecting it, there was no war.  War conditions would have been easier for us than this."

194.    Apart from the significant death, physical injury, and mental harm wrought by the Beirut Blast, the explosion caused untold damage to the fabric of the city, destroying homes, jobs, and key services such as medical infrastructure and education facilities.  It has been estimated that 70,000 people lost their jobs as a result of the blast, and officials have said that the blast might have caused economic losses totaling $15 billion.

195.    In terms of damage to buildings, it is thought that the Beirut Blast caused heavy damage to at least 50,000 residential homes and that 9,200 buildings were damaged within a 3 km radius of the port, affecting over 200,000 people.  Furthermore, many of the neighborhoods hardest hit by the blast included numerous historic structures.  Indeed, buildings closest to the port were some of the oldest and most culturally significant in the city, including the Sursock Palace, home of Plaintiff Mary Deville Cochrane.

196.    Almost 180 schools were damaged to some degree during the Beirut Blast.  It is estimated that over 85,000 students were registered at schools that were damaged, many of whom experienced at least some interruption to their schooling as a result.

197.     In a matter of moments, the Beirut Blast cut down hundreds of innocent people and injured thousands more.  The blast uprooted the structural, social, and cultural underpinnings of the community.  Many of those changes are likely irreversible.  Others will take significant time to redress.

***TGS Acquires Spectrum and Assumes Spectrum's Liabilities***

198.     In or about May 2019, prior to the Beirut Blast, TGS announced that it planned to acquire Spectrum.  The "merger plan" entered into by the boards of directors of the two companies reflected "a contemplated merger through which Spectrum is merged into a wholly owned subsidiary of TGS": "TGS AS," defined as "TGS NewCo." in the merger plan.

199.     TGS AS or TGS NewCo. is a company formed under the laws of Norway.  On information and belief, the company was formed solely for the purpose of facilitating TGS's acquisition of Spectrum.

200.     Under the merger plan, TGS NewCo would "acquire all assets, rights and obligations of Spectrum."

201.     The merger plan indicates that, as of writing, "Spectrum has 13 employees.  TGS NewCo has no employees."  The plan also notes that "the merger consideration for the shareholders in Spectrum will consist of shares in TGS NewCo's parent company TGS."

202.     After the merger, Spectrum would "cease to exist as a company listed on Oslo Stock Exchange" and TGS would "continue to be listed on Oslo Stock Exchange after the merger."  Spectrum's CEO later became a director at TGS.

203.     The merger plan includes several appendices, including "financial statements, annual reports and auditor's reports for the last three years" for TGS and Spectrum.  The plan notes that "TGS NewCo has not prior to the merger prepared financial statements."

204.     On or about August 2019, TGS announced that it had completed its acquisition of Spectrum.

205.     TGS's most recent annual report, for the year 2020, explains: "TGS ASA acquired 14 August 2019 100% of the outstanding shares and voting rights of Spectrum ASA through a merger transaction."

206.     The same annual report also indicates that TGS owns 100% of the shares of its subsidiary TGS AS (TGS NewCo).

207.     On information and belief, TGS AS is an agent and/or alter ego of TGS ASA.

208.     As such, TGS is responsible for the liabilities of TGS AS, including the liabilities of Spectrum that TGS AS acquired during TGS's acquisition of Spectrum in 2019.

209.     Likewise, TGS–NOPEC Geophysical Co., TGS ASA's primary subsidiary, is an agent and/or alter ego of TGS ASA.  TGS–NOPEC Geophysical Co. is wholly owned by parent TGS ASA.

210.     As demonstrated in examples above, TGS holds itself out to the public as one overarching entity with its operational headquarters in Houston, Texas, and its corporate headquarters in Oslo, Norway.

211.     On information and belief, executives perform the same roles for both TGS ASA and TGS–NOPEC Geophysical Co. without distinction.  For example, Kristian K. Johansen serves as chief executive for both entities and Tana Pool serves as the top legal officer for both entities.  In documents publicly filed with the State of Texas, Johansen's and Pool's addresses are listed as the office address for TGS–NOPEC Geophysical Co. in Houston, Texas.

212.     On TGS's website, the company lists the former address of Spectrum as one of TGS's office locations.

*The Lebanese Domestic Investigation*

213.   According to Human Rights Watch, "The domestic investigation into the August 4, 2020, explosion has failed to meet international standards.  Human Rights Watch has documented a range of procedural and systemic flaws in the domestic investigation that render it incapable of credibly delivering justice, including immunity for high-level political officials, lack of respect for fair trial standards, and due process violations.  These problems are compounded by a structural lack of independence in the judiciary."

214.   Nadim Houry, the executive director of the Arab Reform Initiative, similarly told the media that "trust in the local judicial system is non-existent – they've never resolved a single political assassination."

215.   Human Rights Watch has for years investigated grave human rights abuses in Lebanon for which there has been no accountability in the judicial system, including allegations of torture, the killing and excessive use of force against protesters by security agencies, abuses against migrant domestic workers, and the silencing of dissent.

216.   On October 1, 2021, U.S. Senators Bob Menendez (D-N.J.) and Jim Risch (R-Idaho), Chairman and Ranking Member of the Senate Foreign Relations Committee released the following statement in reaction to the suspension of Judge Tarek Bitar's investigation into the 2020 Beirut port blast in the wake of calls for his dismissal:

> We are extremely concerned by the suspension of Judge Tarek Bitar's investigation into the devastating August 4, 2020, explosion at the Port of Beirut which killed more than 200 people and injured thousands more. The Lebanese people, many of whom continue to suffer physical and economic impacts of the blast, deserve accountability for this tragedy. Furthermore, we are alarmed by Hezbollah's reported role in driving the decision to suspend this critical investigation. Judge Bitar is a respected, and by all accounts impartial, jurist with over a decade of service to his country as a judge. It is incumbent upon the Lebanese government to ensure that

judges and other investigators can safely carry out their duties and complete this investigation.

217.    These structural weaknesses in the Lebanese judiciary, as well as its track record of failing to investigate and hold accountable perpetrators of grave crimes and rights abuses, make clear that there is little likelihood of justice for the victims of the explosion and the Lebanese public in the Lebanese domestic courts as they are today.

218.    The domestic investigation is being obstructed and delayed by baseless complaints to dismiss the investigative judge—who is the second judge to preside after the first one was dismissed on similar grounds.  In addition, officials criminally charged in the Beirut Blast investigation have raised claims against the State for gross misconduct of the investigative judge.  These frivolous cases reached over 26 in number and have led to extensive delays in the probe.  The investigation has been suspended completely for about seven months.

219.    Several suspects—including some current Members of Parliament and heads of security agencies—have refused to appear for questioning with no repercussions.  At the same time, the investigative judge has been publicly threatened by political leaders.

220.    In parallel with the investigation of the Beirut Blast, another investigation was taking place regarding another ship "the Trader" carrying 10 tons of ammonium nitrate in addition to other explosives and hunting rifles on its way to Lebanon without authorization from the Lebanese government or the knowledge of the UNIFIL's forces present in Lebanese territorial waters. It was intercepted by the Greek authorities west of the island of Crete on February 27, 2016, before its arrival to the port of Beirut.

221.    The indictment in Lebanon noted that the Greek authorities are still holding the rifles but sought to send the ammonium to "its main destination Congo, in 2020."  The indictment also identified two Lebanese nationals as culprits of a falsification scheme.

222.     Under the current political conditions in the area and the rampant corruption,

Lebanon has become a fertile ground to make available hazardous chemical substances and

extend the benefit to various people including political figures.

## FIRST CLAIM FOR RELIEF
**Strict Liability Resulting in Wrongful Death brought by Plaintiffs Sarah Copland, Mary Deville Cochrane, Tania Daou, Cedric Ellis Alam, and Yann Victor Alam against All Defendants**

223.     Paragraphs 1 through 222 above are repeated and realleged, as if fully set forth

herein.

224.     Spectrum and/or its agents including GSC Jordan selected the Rhosus—a decrepit

and inadequate ship already at capacity with 2,750 tonnes of ammonium nitrate—to transport

heavy seismic equipment from Beirut, Lebanon, to Jordan.  The selection of the Rhosus created a

high degree of risk of harm to person and property in the Port of Beirut.

225.     The likelihood was great that harm would result from the Rhosus's massive cargo

of ammonium nitrate, a common element used in explosives.

226.     Spectrum and/or its agents including GSC Jordan failed to eliminate the risk of

harm and indeed increased the risk when it planned to load heavy seismic equipment onto the

already-overburdened Rhosus.

227.     The last-minute selection of the Rhosus, which was fully loaded with ammonium

nitrate, and already underway and purportedly bound for Mozambique, was not consistent with

common practice in the industry.

228.     Once the Rhosus was unable to transport the seismic survey equipment and

immobilized in the Port of Beirut, neither Spectrum nor any of its agents (including GSC Jordan)

made any effort to ensure the safekeeping of the massive amounts of ammonium nitrate that had

entered the port as a direct result of the chartering of the Rhosus.

229.     No intervening force broke the causal connection because the explosion was itself probable or foreseeable by the Defendants and the injuries caused by the explosion were of the kind expected to result from such an action.

230.     According to the terms of Spectrum's contract with the Ministry of Energy, Spectrum was responsible for any breach of safety standards by third parties, which included responsibility for the actions of its subcontractor GSC Jordan and agents acting at the direction of GSC Jordan.

231.     Spectrum's and/or its agents' actions constituted abnormally dangerous and/or ultrahazardous conduct that resulted in the deaths of Plaintiffs' relatives when the ammonium nitrate the Rhosus transported to the Port of Beirut exploded on or about August 4, 2020.

232.     Plaintiffs are entitled to monetary relief, including for moral damage, such as deprivation of life's pleasures, loss of social status and emotional damage, psychological pain, loneliness, and direct, indirect, and future damages.

233.     In 2019, TGS ASA acquired Spectrum and assumed its liabilities.

234.     By reason of the foregoing, Defendants are liable in the amount exceeding $1 million dollars per Plaintiff plus interest, attorneys' fees, and costs.

**SECOND CLAIM FOR RELIEF**
**Strict Liability Resulting in Property Damage brought by Plaintiffs Mary Deville**
**Cochrane, Fouad Debs against All Defendants and Strict Liability Resulting in Personal**
**Injury brought by All Natural Plaintiffs against All Defendants**

235.     Paragraphs 1 through 234 above are repeated and realleged, as if fully set forth herein.

236.     Spectrum and/or its agents including GSC Jordan selected the Rhosus—a decrepit and inadequate ship already at capacity with 2,750 tonnes of ammonium nitrate—to transport

heavy seismic equipment from Beirut, Lebanon to Jordan.  The selection of the Rhosus created a high degree of risk of harm to person and property in the Port of Beirut.

237.    The likelihood was great that harm would result from the Rhosus's massive cargo of ammonium nitrate, a common element used in explosives.

238.    Spectrum and/or its agents including GSC Jordan failed to eliminate the risk of harm and indeed increased the risk when it planned to load heavy seismic equipment onto the already-overburdened the Rhosus.

239.    The last-minute selection of the Rhosus, which was fully loaded with ammonium nitrate, and already underway and ostensibly bound for Mozambique, was not consistent with common practice in the industry.

240.    Once the Rhosus was unable to transport the seismic survey equipment and was immobilized in the Port of Beirut, neither Spectrum nor any of its agents (including GSC Jordan) made any effort to ensure the safekeeping of the massive amounts of ammonium nitrate that had entered the port as a direct result of the chartering of the Rhosus.

241.    The government's impounding of the Rhosus and the explosion should and could have been reasonably anticipated by Spectrum given its break from industry practices, the vessel's condition, and the danger posed by the ammonium nitrate.

242.    According to the terms of Spectrum's contract with the Ministry of Energy, Spectrum was responsible for any breach of safety standards by third parties, which included responsibility for the actions of its subcontractor GSC Jordan and agents acting at the direction of GSC Jordan.

243.    Spectrum's and/or its agents' actions constituted abnormally dangerous and/or ultrahazardous conduct that resulted in damage to Plaintiffs' real and personal property and

personal injury to Plaintiffs themselves when the ammonium nitrate the Rhosus transported to the Port of Beirut exploded on or about August 4, 2020.

244.     In 2019, TGS ASA acquired Spectrum and assumed its liabilities.

245.     By reason of the foregoing, Defendants are liable in the amount exceeding $1 million dollars per Plaintiff plus interest, attorneys' fees, and costs.

### THIRD CLAIM FOR RELIEF
**Negligence Resulting in Wrongful Death brought by Plaintiffs Sarah Copland, Mary Deville Cochrane, Tania Daou, Cedric Ellis Alam, and Yann Victor Alam against All Defendants**

246.     Paragraphs 1 through 245 above are repeated and realleged, as if fully set forth herein.

247.     Spectrum had a duty to exercise reasonable care in accordance with international standards and other applicable law when selecting a subcontractor or subcontractors to carry out its operations in Lebanon.

248.     Spectrum breached its duty to exercise reasonable care in selecting GSC Jordan. According to the terms of Spectrum's contract with the Ministry of Energy, Spectrum was responsible for any breach of safety standards by third parties, which included responsibility for the actions of its subcontractor GSC Jordan and agents acting at the direction of GSC Jordan.

249.     GSC Jordan, in turn, had a duty to exercise reasonable care in accordance with international standards and other applicable law when chartering a vessel to transport seismic equipment from Beirut, Lebanon to Jordan.

250.     GSC Jordan breached its duty of care and acted negligently in selecting the Rhosus as the ship to transport heavy seismic equipment from Beirut, Lebanon, to Jordan, because the ship was riddled with deficiencies and already fully loaded with ammonium nitrate prior to its arrival in Beirut.

251.    When the ammonium nitrate the Rhosus had been carrying exploded in the Port of Beirut, the explosion killed numerous people, including relatives of Plaintiffs.

252.    The explosion was probable and foreseeable due to GSC Jordan's and Spectrum's failure to exercise reasonable care.

253.    But for Spectrum's negligence in selecting GSC Jordan as its subcontractor and for recklessly allowing GSC Jordan's to charter Rhosus, the payload of ammonium nitrate would not have entered the Port of Beirut and Plaintiffs' relatives would not have been killed by the subsequent explosion.

254.    Spectrum's negligence was a substantial factor in the explosion that caused the death of Plaintiffs' relatives.

255.    Plaintiffs are entitled to monetary relief for moral damage, including deprivation of life's pleasures, loss of social status and emotional damage, psychological pain, loneliness, and direct, indirect, and future damages.

256.    In 2019, TGS ASA acquired Spectrum and assumed its liabilities.

257.    By reason of the foregoing, Defendants are liable in the amount exceeding $1 million dollars plus interest, attorneys' fees, and costs.

## FOURTH CLAIM FOR RELIEF
**Negligence Resulting in Property Damage brought by Plaintiffs Mary Deville Cochrane, Fouad Debs against All Defendants and Negligence Resulting in Personal Injury brought by All Natural Plaintiffs against All Defendants**

258.    Paragraphs 1 through 257 above are repeated and realleged, as if fully set forth herein.

259.    Spectrum had a duty to exercise reasonable care in accordance with international standards and other applicable law when selecting a subcontractor or subcontractors to carry out its operations in Lebanon.

260.     Spectrum breached its duty to exercise reasonable care in selecting GSC Jordan. According to the terms of Spectrum's contract with the Ministry of Energy, Spectrum was responsible for any breach of safety standards by third parties, which included responsibility for the actions of its subcontractor GSC Jordan and agents acting at the direction of GSC Jordan.

261.     GSC Jordan, in turn, had a duty to exercise reasonable care in accordance with international standards and other applicable law when chartering a vessel to transport seismic equipment from Beirut, Lebanon, to Jordan.

262.     GSC Jordan breached its duty of care and acted negligently in selecting the Rhosus as the ship to transport heavy seismic equipment from Beirut, Lebanon, to Jordan, because the ship was riddled with deficiencies and already fully loaded with ammonium nitrate prior to its arrival in Beirut.

263.     When the ammonium nitrate the Rhosus had been carrying exploded in the Port of Beirut, the explosion killed numerous people, including relatives of Plaintiffs.

264.     But for Spectrum's negligence in selecting GSC Jordan as its subcontractor and GSC Jordan's negligence in chartering the Rhosus, the payload of ammonium nitrate would not have entered the Port of Beirut and Plaintiffs' real and personal property would not have been damaged nor would they have suffered injuries by the subsequent explosion.

265.     The explosion was an expected result of the Defendants breach of duty which could and should have been reasonably anticipated.

266.     Spectrum's negligence was a substantial factor in the explosion that caused damage to the real and personal property of Plaintiffs and personal injury to Plaintiffs themselves.

267.     In 2019, TGS ASA acquired Spectrum and assumed its liabilities.

268.     By reason of the foregoing, Defendants are liable in the amount exceeding $1 million dollars per Plaintiff plus interest, attorneys' fees, and costs.

### FIFTH CLAIM FOR RELIEF
**Violation of the Environmental Protection Law of Lebanon
brought by All Plaintiffs against All Defendants**

269.     Paragraphs 1 through 268 above are repeated and realleged, as if fully set forth herein.

270.     Articles 44 and 45 of the Environmental Protection Law of Lebanon (Law 444/2002) impose requirements on the handling of harmful and/or dangerous chemicals that may pose a threat to public health and safety.  Violations of the Environmental Protection Law subject perpetrators to liability under the Penal Code of Lebanon.

271.     Spectrum and its agents in Lebanon failed to comply with provisions of the Environmental Protection Laws, resulting in the Beirut Blast and unspeakable damage to Plaintiffs and countless others.

272.     In 2019, TGS ASA acquired Spectrum and assumed its liabilities.

273.     Under Article 132 of the Penal Code and Articles 134 and 136 of the Obligations and Contracts Law of Lebanon, one who violates the Penal Code is monetarily liable to victims for damage caused.

274.     By reason of the foregoing, Defendants are liable in the amount exceeding $1 million dollars per Plaintiff plus interest, attorneys' fees, and costs.

### SIXTH CLAIM FOR RELIEF
**Violation of the Penal Code of Lebanon brought by All Plaintiffs
against All Defendants**

275.     Paragraphs 1 through 274 above are repeated and realleged, as if fully set forth herein.

276.     Article 312 of the Penal Code of Lebanon criminalizes improper handling of explosive or flammable materials, toxic or incendiary products, or parts used in their composition or manufacture.

277.     Spectrum and its agents in Lebanon failed to properly handle the ammonium nitrate aboard the Rhosus, resulting in the Beirut Blast and unspeakable damage to Plaintiffs and countless others.

278.     In 2019, TGS ASA acquired Spectrum and assumed its liabilities.

279.     Under Article 132 of the Penal Code and Articles 134 and 136 of the Obligations and Contracts Law of Lebanon, one who violates the Penal Code is monetarily liable to victims for damage caused.

280.     By reason of the foregoing, Defendants are liable in the amount exceeding $1 million dollars per Plaintiff plus interest, attorneys' fees, and costs.

### SEVENTH CLAIM FOR RELIEF
**Survival Action brought by Plaintiffs Sarah Copland, Mary Deville Cochrane, Tania Daou, Cedric Ellis Alam, and Yann Victor Alam against All Defendants**

281.     Paragraphs 1 through 280 above are repeated and realleged, as if fully set forth herein.

282.     In addition to damages suffered directly by Plaintiffs for loss of their loved ones during the Beirut Blast, as alleged above, Plaintiffs also seek damages for the pain and suffering, including mental anguish, of their deceased relatives sustained as a result Beirut Blast.

283.     By reason of the foregoing, Defendants are liable in the amount exceeding $1 million dollars per Plaintiff plus interest, attorneys' fees, and costs.

## DAMAGES

### A.  GROSS NEGLIGENCE

284.    The conduct of each of the Defendants, as outlined above, was committed with such knowledge of its danger to the public and disregard of the consequences as to constitute "gross negligence," as that term is defined pursuant to the Texas Damages Act, Texas Civil Practice and Remedies Code § 41.001(11), as follows:

> "Gross negligence" means an act or omission:
> (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
> (B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

285.    Such gross negligence on the part of each Defendant was the proximate cause of the injuries to and damages suffered by Plaintiffs.

### B.  EXEMPLARY DAMAGES

286.    As a result of their grossly negligent conduct, Defendants are liable to Plaintiffs, on an individual basis, for exemplary damages to be assessed against each of the above-named Defendants and apportioned among them, in appropriate amounts.

287.    Such award of exemplary damages is authorized by the Texas Damages Act, Texas Civil Practice and Remedies Code §§ 41.001, et seq., and specifically § 41.003(a)(3).

288.    Further, the statutory limit on exemplary damages as stipulated in § 41.008 of the Texas Damages Act, Texas Civil Practice and Remedies Code, does not apply because Plaintiffs seek recovery of exemplary damages based on conduct, by Defendants, described as a felony in:

i.    Tex. Penal Code § 22.04 by intentionally, knowingly, recklessly and with criminal negligence causing serious bodily injury and death to a child, and

ii.   Tex. Penal Code § 32.43 by, without consent, intentionally and knowingly soliciting, accepting, or agreeing to accept any benefit from another person on agreement or understanding that the benefit would influence the conduct of the fiduciary in relation to the affairs of his beneficiary.

**PLAINTIFFS' CHALLENGE TO THE CONSTITUTIONALITY OF THE TEXAS DAMAGES ACT § 41.008 LIMITATION ON EXEMPLARY DAMAGES**

289.   Plaintiffs challenge the constitutionality of the exemplary damage limit under the Texas Damages Act, Texas Civil Practice and Remedies Code § 41.008, as follows:

i.    Plaintiffs' claims for exemplary damages against Defendants are not or should not be limited under the Texas Civil Practice and Remedies Code, Chapter 41, § 41.008 because:

a.    Tex. Civ. Prac. & Rem. Code § 41.008 violates the Plaintiffs' rights to Due Process and/or Equal Protection Clauses of the laws under the Constitution of the United States.

b.    Tex. Civ. Prac. & Rem. Code § 41.008 violates the Plaintiffs' rights under the Equal Protection Clause of the Texas Constitution, Article I, § 3.

c.    Tex. Civ. Prac. & Rem. Code § 41.008 violates the Plaintiffs' rights under the Open Courts Clause, of the Texas Constitutions, Article I, § 13.

ii.   This pleading of the Plaintiffs' challenging the constitutionality and/or statutory validity of the limitation on exemplary damages under the Texas Civil Practice and Remedies Code § 41.008 is based upon the above-described good faith argument for the reversal, modification, or constitutional overturning of existing law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request judgment as follows:

A.    On the First Claim for Relief, awarding damages in favor of Plaintiffs, in an amount to be determined at trial, but in no event less than $1,000,000 per Plaintiff;

B.    On the Second Claim for Relief, awarding damages in favor of Plaintiffs, in an amount to be determined at trial, but in no event less than $1,000,000 per Plaintiff;

C.    On the Third Claim for Relief, awarding damages in favor of Plaintiffs, in an amount to be determined at trial, but in no event less than $1,000,000 per Plaintiff;

D.    On the Fourth Claim for Relief, awarding damages in favor of Plaintiffs, in an amount to be determined at trial, but in no event less than $1,000,000 per Plaintiff;

E.    On the Fifth Claim for Relief, awarding damages in favor of Plaintiffs, in an amount to be determined at trial, but in no event less than $1,000,000 per Plaintiff;

F.    On the Sixth Claim for Relief, awarding damages in favor of Plaintiffs, in an amount to be determined at trial, but in no event less than $1,000,000 per Plaintiff;

G.    On the Seventh Claim for Relief, awarding damages in favor of Plaintiffs, in an amount to be determined at trial, but in no event less than $1,000,000 per Plaintiff; and

H.    A Declaration that Exemplary Damages are not capped in this case for any claim of relief because of the above-argued statutory exemptions and/or the unconstitutionality of § 41.008 of the Texas Damages Act, Texas Civil Practice and Remedies Code.

I.    Exemplary Damages in excess of $250,000,000.00 or a fair and reasonable amount of monetary relief as allowed by other applicable law to be determined at trial and by the Court.

J.    Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated: July 11, 2022
Austin, Texas

Respectfully submitted,

FORD O'BRIEN LANDY LLP

By: _____

Matthew A. Ford (Tex. Bar No. 24119390)
3700 Ranch Road, 620 South
Austin, TX 78738
(212) 858-0040 (main)
(212) 444-4886 (direct)
mford@fordobrien.com

*Attorneys for Plaintiffs*